David S. Casey, Jr., SBN 060768
*dcasey@cglaw.com*
Gayle M. Blatt, SBN 122048
*gmb@cglaw.com*
Jeremy Robinson, SBN 188325
*jrobinson@cglaw.com*
Ethan T. Litney, SBN 295603
*elitney@cglaw.com*
Alyssa Williams, SBN 310987
*awilliams@cglaw.com*
**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

Attorneys for Plaintiffs and the Class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUSTIN HAVARD, JAMES KROLICK, REGINA GONZALEZ-PHILLIPS, and JOE BUCKINGHAM, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO & COMPANY, and WELLS FARGO BANK, N.A,, individually and D/B/A WELLS FARGO DEALER SERVICES<br><br>Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Dustin Havard, James Krolick, Regina Gonzalez-Phillips, and Joe Buckingham, on behalf of themselves and all others similarly situated, file this Class Action Complaint ("Complaint") against Defendants Wells Fargo & Company, a Delaware Corporation, and Wells Fargo Bank, N.A., a National Banking Association, individually as doing business as Wells Fargo Dealer Services (collectively "Defendants" or "Wells Fargo"), and based on information and belief and investigation of counsel, allege as follows:

## INTRODUCTION

1. With the publication of a single groundbreaking article, hundreds of thousands of angry Wells Fargo customers realized they were the target of a fraudulent insurance scheme to intentionally charge customers for insurance they didn't want or need.

2. On July 27, 2017, *The New York Times* reported to the world that for almost a decade, Wells Fargo worked with insurance underwriter National General Insurance ("National General") to charge thousands of customers for unnecessary and duplicative auto insurance without their authorization.

3. This insurance, generally referred to as Collateral Protection Insurance ("CPI") is typically assessed on a customer by Wells Fargo if the customer's insurance coverage cannot be found in National General's database, and the customer does not otherwise provide proof of insurance. CPI is regularly much more expensive than auto insurance customers can find in the marketplace.

4. However, Wells Fargo and National General made little to no effort to check whether customers had underlying insurance before assessing CPI, often without providing notice or inquiring about a customer's insurance status. This resulted in hundreds of thousands of customers being wrongfully assessed charges for CPI. When customers complained to Wells Fargo about the CPI charges, and implored Wells Fargo to remove the CPI, Wells Fargo seemingly had a policy of ignoring their customers' proof of insurance, and made it difficult or refused to remove the CPI.

5. This scheme earned Wells Fargo millions of dollars in interest payments,

penalties, fees, and commissions or "kickbacks" for the unnecessary and unauthorized CPI it "sold" to customers.

6.    The financial harm from the addition of CPI included the charges for CPI premiums and interest, as well as charges for insufficient funds, late fees, and charges related to repossessions of customers' vehicles.

7.    In addition, thousands of customers spent countless hours attempting in vain to prove the existence of their underlying insurance and convincing Wells Fargo to remove the CPI, endured harm to their credit reports, and have been forced to deal with the shame and embarrassment of having a car being unrightfully repossessed.

8.    Wells Fargo has admitted it wrongfully obtained millions of dollars from hundreds of thousands of customers who were charged for unnecessary CPI. Perhaps attempting to sway the court of public opinion, Wells Fargo responded to this scandal by stating "We take full responsibility for these errors and are deeply sorry for any harm we caused our customers," and "We found an issue and are making it right for auto customers."

9.    Wells Fargo's response to this scandal omits any discussion or explanation of why its newfound integrity failed to manifest until after *The New York Times* reported on the existence of the insurance scheme, reinforced by an internal report on the issue prepared by a third-party consulting firm. Nor does Wells Fargo attempt to explain how it failed to disclose the existence of this "issue" after it originally received the same internal report stating Wells Fargo owed customers at least $72 million dollars.

10.    The truth is that Wells Fargo isn't deeply sorry for the harm they caused, Wells Fargo is deeply sorry it was caught, and its misdeeds are again public knowledge.

11.    Further, this is not the first time Wells Fargo has been alleged to be involved in a scheme regarding forced-placed insurance. In 2012, in the mortgage context, Wells Fargo was alleged to have received kickbacks on forced-placed insurance premiums which its insurance provider allegedly inflated up to ten times market value. Wells

Fargo later settled these claims for an undisclosed amount[1].

12.     In yet another public scandal, Wells Fargo recently promised it would "make things right" in the wake of its retail banking division being accused of creating over a million unauthorized financial accounts for customers, resulting in a $185 million settlement with regulators. However, that did not include disclosing what it knew about its auto insurance division, and that it might owe customers almost another $100 million, which was omitted from public SEC filings, congressional hearings, and otherwise hidden from the public eye.

13.     Wells Fargo's efforts to get ahead of this scandal by admitting they are at fault is nothing more than a transparent attempt to repair their fragmented reputation. Wells Fargo has promised to "make things right" to customers before, only to further disappoint. There is no reason to believe Wells Fargo's newest round of assurances are any more genuine.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d), and 28 U.S.C. § 1348, this Court has original jurisdiction because the aggregate claims of the members of the proposed Class exceed $5 million, exclusive of costs, and at least one of the members of the proposed Class is a citizen of a different state than Defendants. Further, there are greater than 100 members of the proposed Class nationwide.

15.     The Northern District of California has personal jurisdiction over Defendants because defendants Wells Fargo & Company and Wells Fargo Bank, N.A.'s principal place of business is in this District, and Defendants have otherwise purposefully availed themselves of the benefits and protections of California, and thus have minimum contacts with this District.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because

---

[1] *See Fladell, et al. v. Wells Fargo Bank, N.A., et al.*, Case No. 0:13-cv-60721 (S.D. Fla.)

defendants Wells Fargo & Company and Wells Fargo Bank, N.A.'s principal place of business is in this District, and Defendants transact substantial business within this District. Further, a substantial part of the events or omissions on which Plaintiffs' claims are based occurred in this District.

## INTRADISTRICT ASSIGNMENT

17.    Pursuant to Northern District of California Local Rule 3-2(c) and 3-2(d), assignment to the San Francisco Division (or alternatively, the Oakland Division) is warranted because a substantial part of the events or omissions which give rise to the Plaintiffs' claims occurred in the city of San Francisco, California. Notably, Defendants' principle place of business is San Francisco, California.

## THE PARTIES

18.    Plaintiff Dustin Havard is a resident of Lucedale, Mississippi.

19.    Plaintiff Havard took out an auto loan with Wells Fargo in 2012, when he purchased a 2008 Ford F-150. Throughout the duration of his loan, Plaintiff Havard always maintained sufficient insurance for his vehicle, and never allowed his insurance to lapse.

20.    Wells Fargo added CPI on Plaintiff Havard's loan account on several occasions, resulting in additional charges. When Plaintiff Havard realized he was being charged for CPI, he called his insurance agent (who also happens to be his mother), and provided Wells Fargo with proof of insurance. This happened on several occasions, and the increased charges led to inadvertent underpayments, ultimately resulting in Plaintiff Havard's vehicle being repossessed by Wells Fargo.

21.    In addition to the cost of the unnecessary CPI, Plaintiff Havard was forced to take a day off work to drive for two hours to get his truck back after it was repossessed. Wells Fargo refused to intervene in the repossession process or assist him in reobtaining his vehicle.

22.    Plaintiff James Krolick is a resident of Eureka, California.

23.    Plaintiff Krolick took out an auto loan with Wells Fargo in March 2016, when

he purchased a Ford pickup truck from Jerry Durant Toyota in Granbury Texas.

24.    Around the time of his purchase, Plaintiff Krolick had independent collision and comprehensive insurance coverage for the vehicle. At one point, his original insurance provider went into receivership, and Plaintiff Krolick purchased replacement insurance. Despite Plaintiff Krolick having insurance, Wells Fargo starting charging Plaintiff Krolick for unnecessary CPI. Shortly after realizing he was being charged for CPI, Plaintiff Krolick sent his insurance information to Wells Fargo to clarify the apparent misunderstanding.

25.    Despite his efforts, Plaintiff Krolick discovered he was still being charged by Wells Fargo for CPI. Plaintiff Krolick then called Wells Fargo, but did not receive assistance from the Wells Fargo representative, other than the representative suggesting that he have his insurance agent send his insurance information to Wells Fargo. Plaintiff Krolick spoke to his insurance company, confirmed he had insurance for the vehicle, and asked his insurance representative to send the insurance information to Wells Fargo. Even after Plaintiff Krolick's insurance company sent his insurance information directly to Wells Fargo, Plaintiff Krolick found he was still being charged for CPI.

26.    Plaintiff Krolick ultimately traveled to a Wells Fargo branch office with his insurance information. After the Wells Fargo personnel at the branch office stated they could not directly assist him, Plaintiff Krolick requested that the Wells Fargo representative at the branch fax his insurance information to the appropriate Wells Fargo office. The branch office representative obliged and faxed Plaintiff Krolick's insurance information to Wells Fargo Dealer Services in his presence.

27.    Despite all of Plaintiff Krolick's efforts, he was still being charged for the CPI insurance. After repeated calls to Wells Fargo to attempt to fix the issue, in September of 2016, Plaintiff Krolick sent a certified letter to Wells Fargo requesting credit for the extra money he has paid toward unnecessary CPI. Wells Fargo responded stating they would offer Plaintiff Krolick a credit. However, the credit offered by Wells Fargo was

several hundred dollars less than what Plaintiff Krolick had already paid toward CPI. That month, due to his extreme frustration, Plaintiff Krolick chose not to make his auto loan payment by the due date. Then, shortly after the due date, Plaintiff Krolick changed his mind and made the payment anyway. Until this point, Plaintiff Krolick had always paid his auto loan by the due date.

28.    Several months later, when Plaintiff Krolick looked online to see the amount due on his car loan, he noticed that the amount due included charges for CPI. While Plaintiff Krolick had enough in his checking account to pay his appropriate loan payment (i.e., without charges for CPI), he did not have enough to make the payment with the CPI charge. Wells Fargo, without any authorization, automatically withdrew several hundred dollars from Plaintiff Krolick's checking account, overdrawing the account.

29.    Plaintiff Krolick then filed a claim with the Wells Fargo Liability, Fraud, and Claims department for withdrawing money from his checking account without his authorization. Several days later, Wells Fargo sent Plaintiff Krolick a letter confirming that they had withdrawn the money in error. Ultimately, Plaintiff Krolick was forced to pay hundreds of dollars he didn't owe to Wells Fargo, and his credit was negatively affected by Wells Fargo's actions.

30.    Plaintiff Regina Gonzalez-Phillips is a resident of Saint Paul, Minnesota.

31.    In March 2014, Plaintiff Gonzalez-Phillips purchased a 2010 Chevorlet HHR from the Inver Grove Dealership in Inver Grove Heights, Minnesota. Plaintiff Gonzalez-Phillips got an automobile loan from Wells Fargo.

32.    After her purchase, Plaintiff Gonzalez-Phillips realized that Wells Fargo was charging her for CPI every month, even though she already had insurance for her vehicle. Plaintiff Gonzalez-Phillips called Wells Fargo and provided her insurance information, but Wells Fargo refused to stop charging her for unnecessary CPI.

33.    Finally, Plaintiff Gonzalez-Phillips starting only paying the amount owed for the actual loan payment, and not including the amount for the unnecessary CPI. In

response, Wells Fargo started calling her demanding that she pay for the extra insurance. At one point, Plaintiff Gonzalez-Phillips was being called by Wells Fargo at least once a week, and even received calls at her workplace.

34.    In 2016, Wells Fargo repossessed Plaintiff Gonzalez-Phillips' vehicle, after charging her hundreds in unnecessary CPI.

35.    Plaintiff Joe Buckingham is a resident of Kansas City, Missouri.

36.    In 2012, Plaintiff Buckingham purchased a 2012 Jeep Wrangler Rubicon from a dealership in Raymore, Missouri.

37.    Plaintiff Buckingham's automobile loan was financed through Wells Fargo. Plaintiff Buckingham immediately set up automatic monthly payments for the automobile loan to be deducted from his bank account. For three years, Plaintiff Buckingham never missed a payment and ostensibly never had any issues when he checked to see if the payment was being made.

38.    As Plaintiff Buckingham was planning on buying a home, he was routinely checking his credit. Around June 2015 Plaintiff Buckingham noticed his credit score had dropped, and when he investigated his credit it appeared that he was delinquent on his Wells Fargo loan. When he called Wells Fargo to inquire, Wells Fargo informed him that he didn't have insurance on his vehicle, and that Wells Fargo added a charge for CPI on his car loan without his authorization. Plaintiff Buckingham was charged over $1000 for CPI, resulting in Plaintiff Buckingham's monthly payments going to the CPI, rather than his loan principal. After approximately two months of paying for CPI Plaintiff Buckingham became delinquent, and began to be assessed late fees, affecting his credit score.

39.    As Plaintiff Buckingham had independent insurance on his Jeep Wrangler over the entire duration of the loan, he asked Wells Fargo what he could do to prove he had insurance. Plaintiff Buckingham contacted his insurance agent, who sent the insurance information directly to Wells Fargo.

40.    Plaintiff Buckingham spent hours attempting to get Wells Fargo to remove the

CPI charges and associated late fees from his account, and was forced to significantly delay purchasing a home due to the issues with this credit.

41.    Defendant Wells Fargo & Company is a corporation organized under the laws of Delaware and headquartered in San Francisco, California.

42.    Defendant Wells Fargo N.A. is a national banking association organized and existing under the laws of the United States, with its principal place of business in San Francisco, California.

## FACTUAL ALLEGATIONS

43.    Many customers, including Plaintiffs and members of the Class, financed their vehicle purchases through Defendants, nominally through Wells Fargo Dealer Services, a division of Wells Fargo. Wells Fargo requires its auto loan customers to maintain insurance to protect the vehicle that is the subject of the loan. In the extremely rare event that a customer either fails to obtain sufficient auto insurance, or allows their auto insurance to lapse, Wells Fargo is authorized to purchase and charge that customer for insurance to protect the vehicle, the collateral of the loan. This CPI is underwritten by National General, and is typically much more expensive that auto insurance customers can purchase in the open marketplace.

44.    Wells Fargo received interest on the cost of the CPI policies, as well as many fees due to late payment or insufficient funds.  In addition, Wells Fargo received a commission or "kickback" from National General for each CPI policy purchased for customers until at least 2013.

45.    Both Wells Fargo and National General had a legal and contractual duty to ensure that CPI policies were not applied to loans when a customer already had sufficient underlying auto insurance. National General, one of the largest lender-placed insurance providers in the United States, was supposed to check a database to see if the customer had insurance coverage, and if not, would automatically impose the CPI on the customers' account.

46.    Despite the ubiquity of customers with auto insurance for newly purchased

vehicles, Wells Fargo and National General had a practice of failing to check whether customers had sufficient insurance, resulting in the imposition of CPI, without notice, on hundreds of thousands of customers who maintained sufficient insurance on their vehicles.

47.    As many customers automatically paid their auto loans from Wells Fargo or other bank accounts, many customers could go years without noticing they were being charged for CPI, if they ever noticed at all.

48.    For those customers who did notice the increased charges, working with Wells Fargo to remove the CPI was typically unavailing. Many customers who sent proof of their underlying insurance policies to Wells Fargo had no success in getting the CPI removed. Wells Fargo generally refused to fix the problem, or even grant leniency to its customers whose vehicles were wrongfully being repossessed.

49.    A careful review of consumer complaint databases shows that many consumers went through extremely similar experiences with Wells Fargo improperly adding CPI to their accounts. Customers have taken their disturbing tales of Wells Fargo's practices to a number of consumer awareness platforms, including the Better Business Bureau:

- On August 14, 2016, a customer complained that: "I have worked with Wells Fargo Dealer Services and kept payments with them up to date. Recently after 2 years of paying the branch teller informed me that I was short on my payment. This made no sense as I always paid $30 extra. *I found out that I had received nothing in the mail and they had been charging me supplemental insurance.* I then took my insurance cards to the branch, they faxed it over to the insurance department and told me I would be OK. The next couple days I received calls from [redacted employee name] and [redacted employee ID number] who I informed of the situation and asked them to please put it in the notes as I didn't owe any money, you actually owed me. Without fail the calls continued until [redacted employee name] proceeded to call my parents to get a

hold of me. Worst experience I have ever encountered" (emphasis added).

50.     Similarly, many customers have complained about Wells Fargo's CPI policies and practices on the ConsumerAffairs.com website (all emphasis added):

- On January 14, 2016, a customer complained that: "***I've had insurance through State Farm even since I owned the car. The loan for the car is with Wells Fargo and they keep claiming I don't have insurance. I've even had State Farm send them the proof! Wells Fargo recently sent me a letter saying I must pay a $845 premium for insurance they have purchased for me.***"

- On November 17, 2015, a customer complained that: "Never never never again will I use Wells Fargo and I will be telling anyone who will listen how we were cheated, lied to, and treated like idiots when we had the paperwork to back us up. ***After they attempted to charge us over $1200 in fees and tried to repo the car, we'd had enough and hired a lawyer. Turns out, they had ignored the fact our full coverage insurance had never lapsed which they had on record the whole time. They charged us $250 a month for insurance plus late feels as they will not accept payment without insurance.*** With this info, we were able to have the fees dropped but it took numerous hours on the phone and my credit is screwed. Thanks Wells Fargo."

- On March 5, 2015, a customer complained that: "Wells Fargo has a way to add extra charges to your monthly payments. We purchased a vehicle 6 months ago and added it onto our insurance plan which was sent to Wells Fargo by our insurance company. ***Two months after we purchased the vehicle, Wells Fargo said we didn't have insurance on the vehicle and charged us for their insurance. Once again, we contacted our insurance company, because they will not accept paperwork from the customer, and they again faxed them our insurance paperwork; which was verified by us talking to Wells Fargo and them receiving the paperwork. Everything was fine until last statement saying we now owe an extra $1,541.00 because we don't have insurance.*** I called at

5:14 pm pacific time and customer service said they couldn't help because that part of the company was not open, and that I would have to call back the next day. Why can't they call my insurance company and why can't they get it right. I am paying off the balance tomorrow (minus the insurance they want to charge), will never deal with them and make sure all of our employees know about Wells Fargo and will never recommend them to any associates. I challenge Wells Fargo to prove otherwise."

• On February 5, 2015, a customer complained that: "I have a car loan with Wells Fargo. **They claimed I didn't have car insurance when I bought the car so they added an insurance premium to my loan without my permission. I showed them proof of insurance so they stopped charging me the extra 140.00 a month.**"

• On October 14, 2014, a customer complained that: "From the beginning I've had issues . . . **for a year [Wells Fargo] were charging me insurance saying I didn't have it but the car dealer faxed it before they'd let me drive away with it. Then my insurance company faxed it 4 times**."

• On August 24, 2011, a customer complained that: "**My car had been repossessed after adding on insurance, which I already had.** They are charging me for late payments so, upon their request, I provided my receipts which clearly show that I paid before the deadline . . . if they had only took off all the late payments, my car would not have been repossessed. I believe that Wells Fargo should be accountable for their mistake. They then said that I had to pay before Aug 29, 2011 or my car would be auctioned off."

• On July 19, 2011, a customer complained that: "Can you please get back to me with your info? My fiancee owed $3300 left on his truck he's been paying on FAITHFULLY for 3 years. He had NEVER missed a payment, and has immaculate credit to back that up. Payments were $170 month. **They also added $900 insurance policy to his note 4 months ago, even though they have**

*all the info for his insurance, and refused to remove from the loan amount*."

• On February 8, 2010, a customer complained that: "I went to pay my car loan online and noticed that the amount due was higher than it should have been. The next day I got a phone call stating that I have not made a payment. I told the woman on the phone to check her records, she put me on hold, and replied, *"Oh! I am sorry it looks like Wells Fargo has taken out insurance on your vehicle in October, but we thought you did not have any." I explained I have car insurance and has had it since 06/19/09. The rep then stated that if I pay the owed amount for the insurance, it would be credited to my account. I said why would I pay for something that is not my fault, I always had car insurance. She said, "Well, if even you had it, we thought you did not and you will need to pay the insurance that we took out on the vehicle. We can also repossess your vehicle."*

51.   Similarly, many customers have complained about Wells Fargo CPI policies and practices on the "PissedConsumers.com" website (all emphasis added):

• On December 29, 2016, a customer complained: "I gotten [sic] a 2010 Town & Country last January. The payments were $227 a month. *But since the insurance I had wasn't good enough for them (it was full coverage) they were adding $140 that I wasn't aware of.* So I gotten [sic] behind so a couple of weeks ago it got repo-ed while I was at work. They said it would be $1200 to get back. They told me to leave the keys and to get my belongs [sic] out."

• On December 1, 2016, a customer complained: "I can't believe how bad this company is.  I had to see if anyone was dealing with them as badly as I have been and was shocked to see so many they mistreat!!! *They are trying to repo my car saying I'm over 90 days late. It all started with insurance. First they said I didn't carry it then it turned into not carrying collision. What?!? Of course I did. After MANY attempts someone was supposedly going to take care of. I asked for a number to call back but was told we don't have a direct*

*number for that dept. but they're aware and will take care of. This is after several times being threatened it was going as a charge off because I was in default for not carrying appropriate coverage. All lies.* Then the same rep was to authorize a payment out of my bank because I couldn't pay online or through any automated phone system. What?!? I was told because of the no insurance issue. Really?! You don't want me to be able to pay my loan without sending or western union.   Why in the world would I pay that fee too?! So this rep told me he would authorize payment to come out. I also said I would send in the payment. Well the rep put in wrong account info. After finally getting someone I was told oh you don't have account they moved to an account manager. This person acts like she's the CEO of company tells me I'm 120 days late so they will take car. When I tried explaining situation she could care less. She told me payment address I sent to they no longer use!!! Well why wouldn't the checks be forwarded??  Told me the payment the rep took was an insufficient fund. NO! Nothing ever hit my bank! And to top it off because they put in my account as not carrying correct insurance the payment the rep took over phone months prior was 300 more than my monthly payment!!!!!!!

- On December 1, 2016, a customer complained: "The customer service is horrible*. First, shortly after we bought the car they demanded we prove insurance (which we had), we submitted our insurance via fax several times to the number they supplied and we kept getting letters and calls that we were going to have to reimburse them for $800 since we hadn't submitted anything.* Our insurance rep told us he has had several issues with them with other clients as well. Finally on the fifth/sixth time they received our insurance information."

52.    These consumer complaints depict scenarios extremely similar to those faced by Plaintiffs, and demonstrate that Wells Fargo not only had a pattern and practice for years of improperly charging customers for CPI policies that were much more expensive that comparable policies available in the open marketplace, but also made it

difficult to actually remove CPI insurance once it is placed on a customer's account.

53.     These complaints additionally demonstrate that Wells Fargo knew or should have known about these issues several years before the July 2016 date Wells Fargo alleges it "initiated a review of the CPI program and related third-party vendor practices" "in response to customer concerns," but rather as early as 2010 or earlier. Wells Fargo's claim that "upon our discovery, we acted swiftly to discontinue the program and immediately develop a plan to make impacted customers whole" is an affront to customers who were first notified of Wells Fargo's actions by the *The New York Times* article, over six months after Wells Fargo alleges it had knowledge of these issues.

54.     In addition to directly benefitting from the commissions or "kickbacks" on the CPI policies until at least 2013, Wells Fargo also structured customers loan payments in a way to maximize the interest charged to customers over the life of the loan. The hierarchy of how Wells Fargo applies loan payments is as follows[2]:

1.     Loan interest – the daily interest amount due on your loan

2.     Collateral Protection Insurance (CPI) Interest – the amount of interest on your insurance premium (if applicable)

3.     Principal – the principal payment amount due on your loan

4.     CPI principal – the principal payment on your insurance premium (if applicable)

5.     Payment variance – any amount remaining due from previous payment

6.     CPI variance – any amount remaining due from previous insurance premium payments (if applicable)

7.     Other charges – fees such as nonsufficient funds

55.     This payment structure has the effect of increasing the overall interest

---

[2] *See* "Understanding Your Auto Loan", at: https://www.wellsfargodealerservices.com/consumers/financialeducation/ understandingyourautoloan/default.asp

customers pay to Wells Fargo on their loans, as less of their payment goes to the actual outstanding loan principal each month, and increases the likelihood of underpayments, late payments, fees for insufficient funds, and repossessions. The fact that the addition of CPI policies was not properly disclosed to customers only increased the likelihood of these adverse consequences. Wells Fargo's actions also resulted in significant damage to the credit reports of thousands of customers.

56.     The policies and practices of Wells Fargo and National General, including the failure to adequately verify whether customers had sufficient insurance, the failure to provide notice when applying CPI to a customers' loan, and the failure to remove CPI even after being provided proof of insurance, among other acts and omissions, ultimately resulted in almost 500,000 customers having CPI placed on their loan account for some or all of the time they had adequate vehicle insurance coverage of their own, resulting in tens of millions of dollars of improper charges. This unlawful scheme continued for years until it was brought to light by *The New York Times*.

57.     Wells Fargo's admissions that it simply failed to keep a close enough eye on National General, or that its own internal controls were lacking are extremely misleading. Until recently, Wells Fargo received a direct kickback for every CPI policy placed on a customers' account, in addition the interest and fees they charge as described above. Wells Fargo was a direct participant in a concerted scheme to apply unnecessary and unauthorized insurance policies on customers with inflated premiums, and hoped that customers wouldn't notice. When customers complained, they had a policy of refusing to remove the CPI absent extreme measures, and employed obfuscation and threats of repossession to induce customer capitulation.

## STATUTE OF LIMITATIONS

58.     Defendants knowing, intentional, and fraudulent concealment of its actions that form the basis of Plaintiffs' claims, as further alleged herein, toll any applicable statute of limitations to Plaintiffs' claims. While Plaintiffs have exercised reasonable due diligence in investigating their claims, Defendants actions kept Plaintiffs ignorant

of information required for the prosecution of their claims, including, but not limited to the true nature and extent of the collateral protection insurance scheme. Plaintiffs and members of the Class did not discover, and could not have realistically discovered the true nature and extent of the collateral protection insurance scheme, despite their exercise of reasonable due diligence. Before the recent public reports of the true nature and extent of the collateral protection insurance scheme, based on an internal Wells Fargo report, Plaintiffs could not have realistically discovered the true nature and extent of Defendants' actions.

59.    Defendants are under a continuous duty to disclose to Plaintiffs and members of the Class the true character, quality, and nature of the charges they assess on customers' accounts, as wells as Defendants relationship with National General, its collateral protection insurance underwriter.  Defendants knowingly, intentionally, and fraudulently concealed the true character, quality, and nature of their assessment of the collateral protection insurance premiums against customers' accounts, and Defendants relationship with National General. Plaintiffs and members of the Class reasonably relied upon Defendants' knowing, intentional, and fraudulent concealment.  Based on the foregoing, Defendants are estopped from relying on any statutes of limitation as a defense in this action.

## CLASS ALLEGATIONS

60.    Plaintiffs bring this action on behalf of themselves and the members of the proposed Class under Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following Class:

> All persons in the United States who obtained an auto loan through Wells Fargo Bank, N.A., or its division Wells Fargo Dealer Services, who were assessed charges for collateral protection insurance.

61.    Plaintiffs reserve the right to redefine the Class prior to class certification after having the opportunity to conduct discovery and further investigation.

62.    Plaintiffs reserve the right to establish sub-classes as appropriate.

63.    Excluded from the Class are Defendants, their parents, subsidiaries, affiliates, officers and directors, any entity in which Defendants have a controlling interest, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

64.    Numerosity. Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of members, the precise number which is within the knowledge of Defendant and can be ascertained by discovery and review of Defendants' records.

65.    Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are numerous questions of law and fact common to the Class, which predominate over any questions affecting only individual members of the Class. Common questions of law and fact include, but are not limited to:

(a)    Whether Defendants knew or should have known that communications, disclosures, or loan origination documents provided to Plaintiffs and members of the Class omitted, concealed, or misrepresented the circumstances under which Plaintiffs and members of the Class could be charged for collateral protection insurance;

(b)    Whether Defendants knew of should have known National General insurance failed to adequately determine the existence of sufficient independent automobile insurance prior to adding charges for collateral protection insurance to the loans of Plaintiffs and members of the Class;

(c)    Whether Defendants knew or should have known of the existence of sufficient independent automobile insurance prior to adding charges for collateral protection insurance to the loans of Plaintiffs and members of the Class;

(d)    Whether Defendants failed to properly disclose the addition of collateral protection insurance to the loans of Plaintiffs and members of the Class;

(e)    Whether Defendants omitted or concealed material facts from communications and disclosures to Plaintiffs and members of the Class relating to collateral

protection insurance policies;

(f) Whether documents and statements provided to Plaintiffs and members of the Class contained material omissions or misrepresentations;

(g) Whether Defendants' business practices relating to adding charges for collateral protection insurance to the loans of Plaintiffs and members of the Class violate the California Insurance Code;

(h) Whether Defendants engaged in deceptive, unfair, unlawful and/or fraudulent business practices under California law;

(i) Whether Defendants engaged in a pattern of racketeering activity, as alleged herein;

(j) Whether Defendants engaged in or were a member of a conspiracy, as alleged herein;

(k) Whether Defendants have been unjustly enriched by their conduct;

(l) Whether Plaintiffs and members of the Class sustained damages, and if so, the appropriate amount thereof; and

(m) Whether Plaintiffs and members of the Class are entitled to equitable and declaratory relief, and if so, the nature of such relief.

66.     Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have been injured by the same wrongful, deceptive, and unlawful practices of Defendant and are based on the same legal theories.

67.     Adequacy. Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately assert and protect the interests of the Class, and retained counsel experienced in prosecuting class actions. Plaintiffs have no interests that are adverse to the interests of the members of the Class. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

68.     Superiority of Class Action. Fed. R. Civ. P. 23(b)(3).  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit,

because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by members of the Class are in the millions of dollars, the individual damages incurred by each member of the Class resulting from Defendants' wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

69.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. Additionally, individual actions may be dispositive of the interests of the Class, although certain class members are not parties to such actions.

70.     Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).  The conduct of Defendants is generally applicable to the Class as a whole and Plaintiffs seek equitable remedies with respect to the Class as a whole. As such, the systematic policies and practices of Defendants make declaratory or equitable relief with respect to the Class as a whole appropriate.

71.     Issue Certification. Fed. R. Civ. P. 23(c)(4). In the alternative, the common questions of law and fact, set forth above, are appropriate for issue certification on behalf of the Class.

72.     Application of California law. Because the principle place of business of both Wells Fargo & Company and Wells Fargo, N.A. is California, and all of the key decisions and operations of both defendants emanate from California, California law can and should apply to claims relating to the fraudulent scheme alleged herein, even those made by persons who reside outside of California.

## CLAIMS ON BEHALF OF THE CLASS

## FIRST CAUSE OF ACTION

### Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO")

### (18 U.S.C. § 1962(c))

73.     Plaintiffs hereby incorporate all other paragraphs in this Complaint and restate them as though fully set forth herein.

74.     Plaintiffs bring this cause of action on behalf of themselves and members of the Class.

75.     Defendants Wells Fargo & Company, Wells Fargo Bank, N.A., and National General Insurance are all "persons" within the meaning of 18 U.S.C. § 1961(3).

76.     Plaintiffs and the members of the Class are each "persons" within the meaning of 18 U.S.C. § 1961(3) who have been injured in their business or property by reason of Defendants' wrongful conduct in violation of 18 U.S.C. § 1962(c).

77.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

78.     As explained in detail below, Defendants sought to extract millions of dollars of revenue from Plaintiffs and members of the Class through the fraudulent issuance of unnecessary and unauthorized CPI policies in connection with Wells Fargo auto loans. Defendants' misconduct violated section 1962(c).

## RICO ENTERPRISE

79.     At all relevant times, in violation of 18 U.S.C. § 1962(c), Wells Fargo & Company, Wells Fargo Bank, N.A., and National General Insurance Company, formed and conducted the affairs of an association-in-fact enterprise (as defined in 18 U.S.C. § 1961(4)), which is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of maximizing profits through a course of conduct of unlawfully charging Plaintiffs and members of the Class for

unrequested, unnecessary, unauthorized, unlawful, undisclosed collateral protection insurance policies in relation to their automobile loans financed through Defendants. This association-in-fact enterprise is sometimes referred to herein as the "CPI Enterprise".

80.    The CPI Enterprise consists of Wells Fargo & Company, including their directors, employees, and agents; Wells Fargo Bank, N.A., including their directors, employees, and agents; and National General Insurance ("National General"), including their directors, employees, and agents.

81.    The CPI Enterprise members devised a scheme to defraud borrowers and obtain money from them by fraud, misrepresentations, omissions, and false pretenses, as alleged herein, to charge Plaintiffs and members of the Class for unrequested, unnecessary, unauthorized, unlawful, undisclosed collateral protection insurance policies in relation to their automobile loans financed through Defendants.

82.    At all relevant times, each member of the CPI Enterprise was a knowing and willful participant in that conduct, and profited from that conduct.

83.    While members of the CPI Enterprise participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise. The CPI Enterprise has a systemic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Defendants, and National General.

84.    Further, the CPI Enterprise had an existence separate and distinct from each of its members, was separate and distinct from the pattern of racketeering in which the Defendants engaged, and was an ongoing and continuing organization consisting of legal entities, including Defendants, along with other individuals and entities, including third parties.

85.    Defendants operated the CPI Enterprise, as described herein, controlling and directing the affairs of the CPI Enterprise and using the other members of the Enterprise as instrumentalities to carry out the fraudulent scheme that fulfills the CPI

Enterprise's purpose.

86.    The fraudulent scheme was a concerted effort by the CPI Enterprise to maximize profits through a course of conduct of unlawfully charging Plaintiffs and members of the Class for unrequested, unnecessary, unauthorized, unlawful, undisclosed collateral protection insurance policies in relation to their automobile loans financed through Defendants.

87.    Since at least 2006, the fraudulent scheme ("CPI Scheme") was accomplished by first having a customer take out an automobile loan with Defendants which allows for CPI policies to be added to the customer's loan only if they lack sufficient automobile insurance or allow sufficient automobile insurance to lapse. Then Defendants communicate the customer's information to National General, who ostensibly checks a database to verify the existence of the customer's sufficient underlying automobile insurance. Regardless of the existence of the customer's automobile insurance status, National General communicates to Defendants that the customer does not have sufficient underlying automobile insurance, and adds a CPI policy with inflated premiums to the customer's loan without notifying the customer. Defendants fail to properly disclose the existence of the CPI policy or the nature of the CPI-related charges, causing the customer to pay for an unnecessary CPI policy. This profits both Defendants and National General through CPI premiums, and coupled with how Defendants structure customer's payments to their loan, the CPI policy leads to increased interest over the life of their loan, in addition to a higher incident of related fees and costs. National General also provided a commission or "kickback" to Defendants for each CPI policy "sold" to customers until at least 2013.

**PREDICATE ACTS / PATTERN OF RACKETEERING ACTIVITY**

88.    Defendants' CPI Scheme, as described above, was facilitated by the use of the United States mail and wires. Defendants' CPI scheme constitutes racketeering activity within the meaning of 18 U.S.C. § 1961(1) as acts of mail fraud (under 18 U.S.C. § 1341) and acts of wire fraud (under 18 U.S.C. § 1343).

89.    In violation of 18 U.S.C. § 1341, and 18 U.S.C. § 1343, Defendants utilized the mail and wire in furtherance of their scheme to defraud automobile loan customers, including Plaintiffs and members of the Class, by profiting from customers under false or fraudulent pretenses. The CPI scheme likely involved thousands of separate instances of use of the United States mail or wire (including communication by Internet, telephone, and facsimile) in furtherance of the scheme, including, but not limited to:

(a) The transmission or communication of marketing materials regarding Defendants' automobile loans sent throughout the United States by mail and wire;

(b) The transmission or communication of automobile loan policies and origination documents sent by Defendants to automobile loan customers and car dealerships by mail and wire;

(c) The transmission or communication of customer information between Defendants to National General by mail and wire;

(d) The transmission or communication of CPI policy information between Defendants to National General by mail and wire;

(e) The transmission or communication of account statements between Defendants and customers by mail and wire;

(f) The transmission or communication of untrue statements that a customer did not have sufficient underlying automobile insurance by mail and wire;

(g) The transmission or communication of demands to provide proof of underlying insurance between Defendants and customers by mail and wire;

(h) The transmission or communication of late fees or delinquencies caused by the addition of unnecessary and unlawful CPI insurance;

(i) The transmission or communications of bills and demands for payment, and collection of payment between Defendants and customers by mail and wire;

(j) The transmission or communication of threats to repossess vehicles from

Defendants to customers by mail and wire;

(k) The acceptance of commissions or kickbacks by Defendants from National General; and

(l) The transmission or communication between Defendants and National General regarding the operation, administration, and conduct of the CPI enterprise by mail and wire.

90.     The mail and wire transmissions described herein were not undertaken in isolation, but were made in furtherance of the CPI Scheme for the purpose of maximizing profit at the expense of Plaintiffs and members of the Class.

91.     Defendants and National General knew, and intended that Plaintiffs and member of the Class, the intended target of the CPI Scheme, would detrimentally rely on the material misrepresentations and omissions made by them, including but not limited to the representation that the premiums, interest, and other charges related to the CPI were actually owed by customers, and would incur increased costs as a result. Without such reliance by the customers, the CPI Scheme could not succeed.

92.     Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Defendants and National General intended to defraud Plaintiffs and members of the Class, the intended victims.

93.     Each instance of racketeering activity alleged herein was related and part of the nexus of the functions and affairs of the CPI Enterprise, had a similar or related function or purpose, involved similar participants and methods of communication, and had similar results affecting similar victims, including Plaintiffs and members of the Class.

94.     Because this cause of action is brought on behalf of Plaintiffs and all similarly situated individuals, believed to number in the hundreds of thousands, it would be impractical to plead all of the details of the scheme with particularity, especially as

many details of the scheme have been purposefully hidden, and may only be discovered from Defendants' and National General's records. However, they are described by the types of predicate acts of mail and/or wire fraud and the period during which they occurred.

95.    The pattern of racketeering activity alleged herein is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

96.    Plaintiffs and members of the Class have been injured in their business or property by reason of, and as a direct and proximate result of, Defendants violations of 18 U.S.C. § 1962(c). Plaintiffs and members of the Class are entitled to treble damages from Defendants, in addition to all costs of this action, plus reasonable attorney's fees, as provided in 18 U.S.C. § 1964(c).

**SECOND CAUSE OF ACTION**

**Conspiracy to Violate the Racketeer Influenced**

**and Corrupt Organizations Act, 18 U.S.C. § 1962(c)**

**(18 U.S.C. § 1962(d))**

97.    Plaintiffs hereby incorporate all other paragraphs in this Complaint and restate them as though fully set forth herein.

98.    Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

99.    As set forth herein, Defendants conspired to violate 18 U.S.C. § 1962(c).

100.    As set forth herein, Defendants have directed and controlled the affairs of the CPI Enterprise, were aware of the nature and scope of the CPI Enterprise's unlawful CPI Scheme, and agreed to participate in it, and adopted the goal of furthering and facilitating it.

101.    Plaintiffs and the members of the Class have been injured in their business or property by reason of, and as a direct and proximate result of, Defendants violations of 18 U.S.C. § 1962(d). Plaintiffs and members of the class are entitled to treble damages

from Defendants, in addition to all costs of this action, plus reasonable attorney's fees, as provided in 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**

**Unfair Business Practices in Violation of Unfair Competition Law ("UCL")**

**(California Business & Professions Code § 17200 *et seq.*)**

102.   Plaintiffs hereby incorporate all other paragraphs in this Complaint and restate them as though fully set forth herein.

103.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

104.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice.

105.   During the relevant time period, Defendants engaged in unfair business practices, as described herein, including charging Plaintiffs and the Class for unrequested, unnecessary, and unauthorized CPI policies, issuing fraudulent statements relating to the charges, failing to remove the CPI policies when confronted with their unnecessary nature and proof of sufficient underlying insurance, and other acts and omissions of material facts as alleged herein. In affirmatively misleading consumers about the nature of the CPI-related charges, Defendants concealed material facts from consumers and caused substantial injury, with no benefit other than to Defendants.

106.   During the relevant time period, Defendants also engaged in unfair business practices by misrepresenting and omitting material facts they were obligated to or should have disclosed, as alleged herein, including that they knew consumers had sufficient underlying insurance. Defendants were in exclusive possession of such information but did not disclose it, even though it was the ostensible basis of the CPI charges. In affirmatively misleading consumers about their knowledge of a consumers sufficient underlying insurance, Defendants concealed material facts from consumers and caused substantial injury, with no benefit other than to Defendants.

107.    Such information as Defendants policies and practices, the true nature of the CPI charges, and Defendants knowledge as to a consumers' sufficient underlying insurance was material to Plaintiffs and the Class in that as reasonable consumers they would have considered such information to be a substantial factor in deciding whether to take out a loan with Defendants, and whether to pay for the CPI insurance. Plaintiffs and the Class had a reasonable expectation that Defendants' would not affirmatively mislead them policies and practices for placing CPI insurance on their accounts.

108.    Defendants' practices, as described here, constitute unfair business practices in violation of the UCL because, among other things, they are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and/or any utility of such practices is outweighed by the harm caused to consumers. Defendants' practices caused substantial injury to Plaintiffs and the Class and are not outweighed by any benefits, and Plaintiffs and the Class could not have reasonably avoided their injuries.

109.    As a result of Defendants' unfair business practices, Plaintiffs have suffered injury in fact and loss of money or property by paying for unnecessary and unauthorized CPI policies, which they would not otherwise have paid had the facts not been misrepresented or omitted and if the material facts been fully disclosed.

110.    Pursuant to Business and Professions Code §17204, Plaintiffs and the Class are entitled to an order of this Court enjoining such conduct on the part of Defendants, and any other orders and judgments that may be necessary to provide for complete equitable monetary relief by disgorging Defendants' ill-gotten gains, including the monies Defendants received or saved as a result of its wrongful acts and practices detailed herein, and restoring to any person in interest such monies paid for CPI premiums, interest, and related fees and penalties, and ordering the payment of full restitution. Otherwise, Plaintiffs and the Class, and members of the general public may be irreparably harmed or denied an effective and complete remedy if such an order is not granted.

111.   Additionally, pursuant to Business and Professions Code §17203, Plaintiffs and the Class seek an order requiring Defendants to immediately cease such unfair business practices.

## FOURTH CAUSE OF ACTION

### Unlawful Business Practices in Violation of Unfair Competition Law ("UCL")

### (California Business & Professions Code § 17200 *et seq.*)

112.   Plaintiffs hereby incorporate all other paragraphs in this Complaint and restate them as though fully set forth herein.

113.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

114.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

115.   Defendants' deceptive and misleading business practices and acts, as described herein, violated and continue to violate, *inter alia*, Title 18 United States Code sections 1341, 1343, and 1962; California Civil Code sections 1572, 1573, 1709, and 1711; and California Insurance Code section 300 *et seq.*

116.   Plaintiffs reserve the right to identify other violations of law as the facts develop.

117.   As a result of Defendants' unlawful business practices, Plaintiffs have suffered injury in fact and loss of money or property by paying for unnecessary and unauthorized CPI policies, which they would not otherwise have paid had the facts not been misrepresented or omitted and the material facts been fully disclosed.

118.   Pursuant to Business and Professions Code §17204, Plaintiffs and the Class are entitled to an order of this Court enjoining such conduct on the part of Defendants, and any other orders and judgments that may be necessary to provide for complete equitable monetary relief by disgorging Defendants' ill-gotten gains, including the monies Defendants received or saved as a result of its wrongful acts and practices detailed herein, and restoring to any person in interest such monies paid for CPI

premiums, interest, and related fees and penalties, and ordering the payment of full restitution. Otherwise, Plaintiffs and the Class, and members of the general public may be irreparably harmed or denied an effective and complete remedy if such an order is not granted.

119.   Additionally, pursuant to Business and Professions Code §17203, Plaintiffs and the Class seek an order requiring Defendants to immediately cease such unlawful business practices.

## FIFTH CAUSE OF ACTION

**Fraudulent Business Practices in Violation of Unfair Competition Law ("UCL")**

**(California Business & Professions Code § 17200 *et seq.*)**

120.   Plaintiffs hereby incorporate all other paragraphs in this Complaint and restate them as though fully set forth herein.

121.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

122.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive reasonable consumers.

123.   Defendants have misrepresented the nature of the loan agreement between Defendants and Plaintiffs and the Class, and their scheme to apply CPI to their account regardless of whether the Plaintiffs or the Class had sufficient insurance.

124.   Further, Defendants failed to disclose material facts regarding the placement of the CPI on the accounts of Plaintiffs and the Class, including providing notice of the placement of the CPI, and fraudulent statements about the nature of the charges, including the increased costs or increased percentage of a customers' payment going to their loan principle, as set forth herein. These undisclosed facts with respect to the placement of the CPI are material in that Plaintiffs and the Class would have considered the facts to be a substantial factor in deciding whether or not to take out a loan with Defendants or paying for the CPI, and would have allowed Plaintiffs and the Class to avoid spending additional money on unnecessary and duplicative insurance.

125.   Plaintiffs and the Class had a reasonable expectation the Defendants would conform their actions to the loan agreements, and would not place CPI insurance on their accounts unless they failed to obtain sufficient insurance, or their insurance lapsed, as demonstrated by the Plaintiffs' expectations as stated herein and the expectations of a reasonable consumer as evidenced by the numerous consumer complaints referenced herein.

126.   Based on the facts set forth herein, Defendants were under a duty to Plaintiffs and the Class to disclose the true nature of their intentions, actions, and the CPI policies. Such a duty existed because Defendants had exclusive possession and knowledge of facts that were not available to consumers and that were material.

127.   Defendants' conduct was and is likely to deceive reasonable customers into believing they would not pay for CPI insurance unless they did not have personal insurance or their personal insurance lapsed, and Plaintiffs were deceived.

128.   As a result of Defendants' fraudulent business practices, Plaintiffs have suffered injury in fact and loss of money or property by paying for unnecessary and unauthorized CPI policies, which they would not otherwise have paid had the facts not been misrepresented or omitted and the material facts been fully disclosed.

129.   Pursuant to Business and Professions Code §17204, Plaintiffs and the Class are entitled to an order of this Court enjoining such conduct on the part of Defendants, and any other orders and judgments that may be necessary to provide for complete equitable monetary relief by disgorging Defendants' ill-gotten gains, including the monies Defendants received or saved as a result of its wrongful acts and practices detailed herein, and restoring to any person in interest such monies paid for CPI premiums, interest, and related fees and penalties, and ordering the payment of full restitution. Otherwise, Plaintiffs and the Class, and members of the general public may be irreparably harmed or denied an effective and complete remedy if such an order is not granted.

130.   Additionally, pursuant to Business and Professions Code §17203, Plaintiffs and

the Class seek an order requiring Defendants to immediately cease such fraudulent business practices.

## SIXTH CAUSE OF ACTION

### Declaratory Relief

131.   Plaintiffs hereby incorporate all other paragraphs in this Complaint and restate them as though fully set forth herein.

132.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

133.   As described herein, the Court has jurisdiction over this matter, and may therefore declare the rights of Plaintiffs and the Class.

134.   Plaintiffs and the Class seek an order declaring that Wells Fargo's practice of imposing unauthorized and unnecessary CPI policies on its automobile loan customers is unlawful, that its practice of failing to disclose such unnecessary CPI policies is unlawful, and that Wells Fargo is liable to Plaintiffs and members of the Class for damages caused by those practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the Class, pray for relief as follows:

1.   An Order certifying that this action may be maintained as a Class Action, appointing Plaintiffs to represent the proposed Class pursuant to Fed. R. Civ. P. 23(a) and designating their counsel as Class Counsel;

2.   An Order enjoining Defendants from future violations of the UCL as alleged herein;

3.   A Declaration of Defendants' actions as unlawful as alleged herein;

4.   An Order awarding restitution and/or disgorgement of Defendants' profits from its unfair and unlawful practices described herein;

5.   An Order awarding compensatory, statutory, and other damages sustained by Plaintiffs and members of the Class;

6.      An Order awarding Plaintiffs and members of the Class applicable civil penalties;

7.      An Order awarding Plaintiffs and members of the Class treble damages under the Racketeer Influenced and Corrupt Organizations Act;

8.      An Order awarding Plaintiffs attorney's fees, expert witness fees and other costs;

9.      An Order awarding pre-judgment and post-judgment interest on any amounts awarded to the extent allowed by law; and

10.     Such other relief as the Court deems proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, on behalf of themselves and members of the Class, hereby demand trial by jury as to all matters so triable.

Dated: August 16, 2017                 CASEY GERRY SCHENK
                                       FRANCAVILLA BLATT & PENFIELD, LLP


                             By:     /s/ Gayle M. Blatt.
                                     Gayle M. Blatt
                                     *gmb@cglaw.com*
                                     Attorneys for Plaintiffs and the Class